Filed 4/10/15  P. v. Luther CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>            Plaintiff and Respondent,<br><br>v.<br><br>DAROLD LUTHER,<br><br>            Defendant and Appellant. | A141546<br><br>(San Mateo County<br>Super. Ct. No. SC016567A) |

Defendant Darold Luther appeals the trial court's order extending for two years his civil commitment to a state mental facility.[1]  He contends that insufficient evidence supported the trial court's determinations that he poses a substantial danger of physical harm to others if released and has serious difficulty controlling his dangerous behavior. We affirm the trial court's order.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

Luther was originally committed to a state mental facility in 1986 after being found not guilty by reason of insanity for discharging a firearm into an inhabited dwelling.  (§ 246.)  Since then, he has remained under state custody but was an outpatient during several periods.  Each of these periods, including those in 1993, 1999, and 2000, ended with Luther's outpatient status being revoked due to his "noncompliance with his

---

[1] The order extending Luther's civil commitment was issued under Penal Code section 1026.5  All statutory references are to the Penal Code.

1

medications and psychiatric decompensation." In 2011, Luther was once again on outpatient status, but he was returned to a hospital setting after he went absent without leave (AWOL).

This appeal arises from two related petitions filed in late 2013 and early 2014. In September 2013, Luther filed an application for a restoration of sanity under section 1026.2. In February 2014, the San Mateo District Attorney filed a petition for an additional two-year extension of Luther's civil commitment. Luther waived his right to a jury trial, and a bench trial was held in March 2014 on both petitions. At trial, Napa State Hospital staff psychiatrist James Eyerman, M.D., testified as an expert for the prosecution. Dr. Eyerman has treated Luther at the hospital for several years, and he prepared the hospital's report recommending an extension of Luther's civil commitment and opining that Luther did not meet the criteria for outpatient treatment. He testified that Luther has a diagnosis of bipolar disorder and exhibits both manic and depressive symptoms. He explained that people with bipolar disorder "may indeed have a lack of what we would consider good judgment or lack of behavior as a reasonable person would. . . . [T]hey would be more likely to do rash or irrational things."

At the time of trial, Luther was assigned to a locked unit. Dr. Eyerman testified that before a patient at Napa State Hospital can be transferred from a locked unit to an open unit, and from there placed on an outpatient status, he or she must first be "stable" for six months to a year. Luther was assigned to the locked unit because in the months leading up to the trial ("around the holiday period") his behavior was considered to be unstable. Dr. Eyerman testified that Luther's behavior involved "periods of irritability and mood swing and that sometimes he actually gets somewhat threatening to the staff." He testified that Luther had verbally threatened both nursing and auxiliary staff, and Dr. Eyerman perceived this behavior "as dangerous." Around the holiday period, Luther told Dr. Eyerman, "You're going to get yours." In response to this regressive behavior, Luther's medication was "titrated upward substantially." Although Luther has not physically harmed any staff at Napa hospital, in 1993 he assaulted a staff person at a different inpatient facility.

2

Dr. Eyerman described Luther as generally "very insightful and very cooperative," but he has also gone through periods where he was "more depressed, irritable, or more agitated and grandiose." According to Dr. Eyerman, Luther "sometimes has difficulty in accepting medication changes or having insight into the fact that he's getting ill . . . . [He] may tend to blame staff, or other patients, or other circumstances, sometimes circumstances which have not much to do with anything on the unit. [This s]eems to be a fabrication of his imagination." Dr. Eyerman opined that Luther posed "a danger to others if left unchecked" due to these characteristics and his history of bipolar disorder. Dr. Eyerman concluded that Luther was still assigned to the locked unit because he "has not yet been able to have a long enough period where he was felt safe to transfer to the open unit." Dr. Eyerman stated, "at this point in time [Luther] would still have a few more months to go given the episode of the sort of deterioration that he experienced around the holiday period."

The trial court extended Luther's civil commitment until April 17, 2016. It observed, "I do feel that the People have established beyond a reasonable doubt both the existence of the mental disease . . . but also that there is a significant danger of physical harm to others based on the totality of circumstances certainly including the episode at the holiday which is troublesome and threatening." The court also denied Luther's application for restoration of sanity.

## II.
### DISCUSSION

### A. *The Governing Statute and the Standard of Review.*

Under section 1026.5, a defendant's civil commitment may be extended by two years where the defendant has been convicted of a felony and has "a mental disease, defect, or disorder" that causes him or her to "represent[] a substantial danger of physical harm to others." (§ 1026.5, subd. (b)(1).) The statute has been interpreted to require the prosecution to prove beyond a reasonable doubt that a defendant's mental disorder causes him or her to have serious difficulty controlling his or her dangerous behavior. (*In re Howard N.* (2005) 35 Cal.4th 117, 135; *People v. Zapisek* (2007) 147 Cal.App.4th 1151,

1164-1165; *People v. Galindo* (2006) 142 Cal.App.4th 531, 537.) "The People are not required to prove the defendant ' "is *completely* unable to control his behavior." ' [Citation.] Instead, the defendant's 'impairment need only be serious, not absolute.' [Citation.]" (*People v. Kendrid* (2012) 205 Cal.App.4th 1360, 1370, original italics.) "[P]roof of a recent overt act is not constitutionally required to extend the commitment of a person found to be criminally insane." (*People v. Overly* (1985) 171 Cal.App.3d 203, 208.)

" ' " 'Whether a defendant "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others" under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony.' [Citation.] 'In reviewing the sufficiency of evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt. [Citations.]' [Citation.]" [Citation.]' " (*People v. Zapisek*, *supra*, 147 Cal.App.4th at p. 1165.) "A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5. [Citation.]" (*People v. Bowers* (2006) 145 Cal.App.4th 870, 878-879.) On the other hand, an expert medical opinion "that is based upon a ' "guess, surmise or conjecture" ' . . . cannot constitute substantial evidence." (*In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1504.)

B.      *Substantial Evidence Supports the Trial Court's Order.*

Luther challenges the trial court's order in two related respects. First, he argues there was insufficient evidence to support a finding he poses a substantial danger of physical harm to others. Second, he argues there was insufficient evidence to support a finding he had serious difficulty controlling his dangerous behavior. We are not persuaded.

The trial court explained that its decision was "based on the totality of circumstances certainly including the episode at the holiday which is troublesome and

4

threatening." The "episode at the holiday" referred to a holiday period spanning several weeks and included instances when Luther verbally threatened staff, reported unhappiness and trouble sleeping, and expressed "grandiose plans with regard to either inventions or something to do with the government." Dr. Eyerman described how many of Luther's troubling bipolar symptoms were recurring and sometimes present even when Luther was taking his medications. They were present at the time of the initial offense, when he went AWOL, and during the period before the trial. When he went AWOL in 2011, he "was grandiose and labile and was using poor judgment" even though he was taking his psychotropic medication as prescribed. Dr. Eyerman's testimony and the record as a whole establish that Luther has continued periodically to exhibit the same symptoms and behaviors he demonstrated when he engaged in the original felony. In our view, this provides substantial evidence supporting the trial court's finding that Luther continues to pose a substantial danger to others.

We disagree with Luther's characterization of Dr. Eyerman's testimony as based on " ' "a guess, surmise or conjecture." ' " (Cf. *In re Anthony C.*, *supra*, 138 Cal.App.4th at p. 1504.) After several years of monitoring Luther at Napa State Hospital, Dr. Eyerman was well aware of Luther's history and mental state. Luther's reliance on *In re Anthony C.* is therefore misplaced. In that case, the appellate court reversed a commitment order because the expert witness failed to prepare a formal risk-assessment evaluation, showed a lack of preparation, was unable to state the risk factors at trial, and was reluctant to quantify the defendant's risk level. (*Id.* at pp. 1506-1507.) Here, by contrast, Dr. Eyerman knew Luther, had treated him for several years, and was definitive in his opinions. Again, "[a] single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence." (*People v. Bowers*, *supra*, 145 Cal.App.4th at p. 879.)

Luther attempts to distinguish his situation from *Bowers*, where the court affirmed an extension of the defendant's commitment because the defendant suffered from command hallucinations and poor anger control and exhibited assaultive behavior. (*People v. Bowers, supra,* 145 Cal.App.4th at p. 879.) Luther claims that the trial court's

5

order cannot be sustained because his symptoms are not as severe as the defendant's in *Bowers*. But section 1026.5 does not define " 'a mental disease, defect, or disorder,' " and trial courts must rely on expert testimony to evaluate whether the standard has been satisfied. (*Bowers*, at pp. 877-878.) The trial court relied on Dr. Eyerman's testimony in concluding that Luther represents a substantial danger of physical harm to others by reason of a mental disease, defect, or disorder, and we, as a reviewing court, are in no position to question that reliance.

Luther argues that Dr. Eyerman failed to provide the Hare Psychopathy Checklist as proof of his dangerousness (*People v. Galindo*, *supra*, 142 Cal.App.4th at p. 534 [the Checklist has " 'one of the bigger correlations with future dangerousness' "]) and that Dr. Eyerman incorrectly made his recommendation based on internal hospital standards rather than the statutory requirements. But Luther provides no authority, and we are aware of none, suggesting that an expert must rely on the Hare Checklist and may not refer to internal hospital standards.

Luther's argument that the prosecution failed to present substantial evidence that his bipolar disorder caused him serious difficulty controlling his dangerous behavior also lacks merit. Dr. Eyerman testified that Luther has had "episodes where he lacks insight," raising the concern that he lacks the self-awareness to realize he is "slipping into his bipolar symptoms or that medication issues may be present." Similarly, Dr. Eyerman's report submitted to the trial court describes when Luther went AWOL in 2011 and how he was decompensating, becoming argumentative, and having "paranoid delusions about a Northstar [an outpatient treatment program] client raping a staff." These behaviors and symptoms are much the same as described during the holiday period, creating the reasonable inference that Luther would again regress if released at this time.

Although it is true that Dr. Eyerman described Luther as "very well controlled" at the time of trial, this description was in response to Luther's medication having been "titrated upward substantially" after the holiday period. As described above, Luther's symptoms can be unpredictable and subject to fluctuation, especially when Luther fails to adhere to his medication protocol. Because Luther was exhibiting many troubling

6

symptoms and a lack of self-awareness in the period preceding trial, substantial evidence demonstrates that Luther's bipolar disorder caused him serious difficulty controlling his behavior.

The cases upon which Luther relies in arguing to the contrary are distinguishable. Unlike in *In re Howard N.*, *supra*, 35 Cal.4th at page 138, where there was no testimony that the defendant's disorder caused him serious difficulty controlling his deviant behavior, here Dr. Eyerman testified to Luther's serious difficulty with control. This case also is distinguishable from *In re Anthony C.*, *supra*, 138 Cal.App.4th 1493, where the appellate court pointed to defendant's appropriate behavior while confined as evidence he had impulse control. (*Id.* at p. 1508.) Here, by contrast, Luther had "been verbally threatening which is considered on the same yardstick as a physical assault." This is sufficient evidence that Luther's symptoms create a serious difficulty in his ability to control his behavior and to act appropriately toward staff and others. We cannot say that the prosecution failed to meet its burden simply because Luther did not physically harm anyone during his recent commitment.

Viewing the record, as we must, in the light most favorable to the trial court's order, we conclude that Dr. Eyerman's testimony and the record as a whole constituted sufficient evidence to establish that Luther has serious difficulty controlling his behavior and would pose a substantial danger of physical harm to others if released. (*People v. Zapisek*, *supra*, 147 Cal.App.4th at p. 1165.)

## III.
### DISPOSITION

The trial court's order is affirmed.

_____
Humes, P.J.

We concur:


_____
Dondero, J.


_____
Banke, J.

8