Filed 9/24/15  P. v. Simmons CA6
(Reposted to correct docket transposition error on Web site)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>MARK STEVEN SIMMONS,<br><br>　　　　Defendant and Appellant. | H041329<br>(Santa Clara County<br>Super. Ct. No. E9909752) |

Defendant Mark Steven Simmons appeals from an order extending his involuntary commitment as a mentally disordered offender (MDO).  On appeal, defendant contends that there was insufficient evidence to support the order.  As set forth below, we will affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

*The Underlying Conviction and Sentence*

In early 1999, defendant, who was then 39 years old, boarded at a home where a 14-year-old girl, D., lived with her mother.  One day, defendant entered D.'s bedroom

---

[1] Defendant's opening brief relies on the factual and procedural summary in *People v. Simmons* (Jan. 31, 2008, H031491) [nonpub. opn.], a prior unpublished opinion of this court regarding defendant.  We take judicial notice of that decision and our prior decisions in *People v. Simmons* (Aug. 25, 2004, H026672) [nonpub. opn.], *People v. Simmons* (Apr. 26, 2006, H028499) [nonpub. opn.], and *People v. Simmons* (Nov. 4, 2013, H039198) [nonpub. opn.].  (Evid. Code, § 452, subd. (d).)  We base our factual and procedural history on those decisions, as well as the record in this case.

wearing only a bathrobe, held D.'s shoulders, and pressed himself against her back until she felt his penis. Similar incidents occurred four or five times. On a separate occasion, D. woke up and discovered that defendant was touching her legs, thighs, and the area between her legs. D. pretended to be asleep, and defendant continued to touch her for 30 minutes or more. D. tried to push defendant away, and he eventually stopped touching her.

In March 1999, defendant pleaded no contest to two counts of lewd and lascivious acts on a 14-year-old girl who was more than 10 years younger than him. (Pen. Code, § 288, subd. (c)(1).)[2] He was placed on probation in May 1999, on condition that he have no contact with D. Probation was revoked in November 1999 because defendant violated that condition. Defendant admitted the probation violation in December 1999, and he was committed to prison for a term of two years eight months.

### Defendant's History of MDO Commitments

In November 2000, defendant was transferred from prison to Atascadero State Hospital for treatment. He was discharged to the Conditional Release Program (CONREP) in August 2001, but shortly thereafter he was re-hospitalized at Napa State Hospital (NSH) because he expressed suicidal ideations and failed to follow the CONREP rules.

In August 2003, the Santa Clara County District Attorney filed a petition, pursuant to the MDO Act (§ 2960 et seq.), to extend defendant's involuntary commitment beyond the expiration of his parole term. A jury found that defendant was an MDO, and the trial court extended defendant's commitment for a one-year period. Between 2004 and 2013, the court periodically extended defendant's MDO commitment.

---

[2] Subsequent unspecified statutory references are to the Penal Code.

*The Current MDO Commitment*

In April 2014, the Santa Clara County District Attorney filed a petition to extend defendant's MDO commitment for an additional year. A court trial on the petition commenced on July 29, 2014. There were two witnesses at the trial, Dr. William Cirimele and defendant.

Dr. Cirimele, a staff psychologist at NSH, testified as an expert in the "diagnosis and treatment of mental disorders and risk assessment." Dr. Cirimele testified that he had been treating defendant at NSH for over a year, since March of 2013.

Dr. Cirimele opined that defendant suffered from pedophilic disorder. He explained: "[Defendant], throughout his life, has had multiple instances of sexually deviant behavior with prepubescent children over a course of time longer than six months, which meets the diagnostic criteria for pedophilic disorder." Dr. Cirimele described several occasions on which defendant engaged in "sexually deviant behavior" with minors: defendant sexually molested a four-year-old child because he believed he had to perform an "evil act" in order to "prepare for a possible mission to free the hostages in Iran," defendant "sexually assaulted" an eight-year-old child because "he wanted to test himself" and "see if he could be a good daddy," and at age 15 or 16 defendant had sexual intercourse with his 10-year-old sister. Dr. Cirimele testified that defendant also suffered from narcissistic personality disorder. He explained that defendant's narcissistic personality disorder "exacerbates the pedophilic disorder due to . . . interpersonal exploitation, lack of empathy, entitlement."

Dr. Cirimele opined that defendant's pedophilic disorder was not in remission. He explained that pedophilic disorder cannot be in remission because "individuals with pedophilic disorder can learn how to control their behavior, but the core attraction to children does not change." When asked if defendant had "received enough sex offender treatment that he could control his behavior if left to his own devices unconditionally

3

released in the community," Dr. Cirimele responded, "No." He testified that defendant had made "no progress" in his sex offender treatment over the last year. He explained that defendant denied having a mental illness and did not "recognize any symptoms or red flags that could cause him to molest a child in the future." Defendant told NSH staff members that "because other cultures treat 13-year-old girls as adults," his underlying conviction was "just a matter of definition because of where it occurred." Dr. Cirimele explained: "[Defendant] believes that since different cultures have different laws about the age of consent, that it is therefore arbitrary and he does not have to follow the laws because they're arbitrary government laws and he does not answer to the government, he answers to God." Dr. Cirimele testified that defendant "believes that he was morally in the right" when he molested 14-year-old D.

Dr. Cirimele also opined that defendant has "serious difficulty controlling his dangerous behavior." Dr. Cirimele explained that "historically, when [defendant] has a thought of assaulting a child, . . . he will." Dr. Cirimele expressed concern that defendant "says that he absolutely has control of his behaviors," yet defendant made the choice to molest children.

Dr. Cirimele finally opined that defendant posed a substantial danger of physical harm to others due to his pedophilic disorder. He explained that defendant's score on the HCR-20, a tool for violence risk assessment, showed that defendant posed a danger of violence. The HCR-20 assesses 20 risk factors for violence, and Dr. Cirimele testified that "[a]ll 20" of those risk factors applied to defendant. Dr. Cirimele also explained that "lack of insight" is a significant factor in determining dangerousness, and he described many circumstances demonstrating defendant's lack of insight regarding his pedophilic disorder. Defendant "is adamant that he was helping" 14-year-old D. when he molested her. Defendant believes he was "help[ing] the country in being able to do a possible mission in Iran" when he molested the four-year-old girl. In the year before the MDO

4

trial, defendant made several statements that were "particularly troubling" and demonstrated a lack of insight into his pedophilic disorder: defendant said he was "more sure than ever that he does not have a pedophilic disorder," defendant told Dr. Cirimele that "there was nothing sexual about the molestation of the four-year-old," defendant "said that if he was a different type of psychopath, he would have just taken [the four-year-old molestation victim] to the cemetery and cut her heart out," and defendant stated that "he doesn't believe he needs sex offender treatment." Defendant additionally stated that "the only reason why he goes to sex offender treatment is so that the judge can't say that he's not doing his treatment." Dr. Cirimele explained that defendant does not understand "how harmful his pedophilic behavior is to the victims," and he also explained that defendant "believes that he is being harmed by the . . .legal system." Dr. Cirimele testified that defendant's belief that "he's the victim" is a "significant risk factor" demonstrating that defendant is unable to obey laws. Dr. Cirimele "fear[ed]" that defendant would molest a child if he were unconditionally released from NSH.

Defendant testified that he did not believe that he suffered from pedophilic disorder. He testified that he did not need the sex offender treatment provided at NSH.

Defendant admitted that he molested 14-year-old D. He described D. as a blond-haired girl who "looked like a high school cheerleader." He explained that his conduct toward D. was an "inoculation" that prevented D. "from killing herself" and engaging in drunk driving. He continued to molest D. even though "there were times that [he] knew that [D.] didn't like the . . . touching."

Defendant admitted that he inserted his finger into a four-year-old girl's vagina. He described the girl as "a pretty little blond" who "looked like a little doll." He explained that he molested the girl as part of a satanic "ritual" designed to "rescue hostages in Iran."

5

Defendant admitted that he "touched" an eight-year-old girl "between her legs." When asked to describe the girl, defendant responded: "Eight-year-old, medium blond hair. Blond hair is my type. I like girls, blue-eyed blonds, green-eyed blonds, I know that." Defendant explained that he molested the eight-year-old girl as an "experiment."

Defendant testified that he was not dangerous and would not molest children if he were released from NSH. He testified that, if he were released from NSH, he would find an angel investor, buy a Tesla, and become an Uber driver.

At the conclusion of the trial, the court ordered defendant's MDO commitment to be extended for one year, until November 2, 2015. The court explained: "I am satisfied beyond a reasonable doubt that [defendant] does qualify for MDO commitment, and therefore, will order that his commitment be continued for an additional year."

## DISCUSSION

Defendant contends that we must reverse the current commitment order due to insufficient evidence. He first asserts that there was insufficient evidence that his pedophilic disorder was not remission. He next asserts that there was insufficient evidence that he currently represented a substantial danger of physical harm to others. As explained below, defendant's arguments are unpersuasive.

### Legal Principles and the Standard of Review

Section 2972 mandates a one-year extension of an MDO's commitment if three criteria are satisfied: "If the court or jury finds that the patient has a severe mental disorder, that the patient's severe mental disorder is not in remission or cannot be kept in remission without treatment, and that by reason of his or her severe mental disorder, the patient represents a substantial danger of physical harm to others, the court shall order the patient recommitted to the facility in which the patient was confined at the time the petition was filed . . . . The commitment shall be for a period of one year from the date of termination of . . . a previous commitment . . . ." (§ 2972, subd. (c).) A recommitment

6

thus "requires proof beyond a reasonable doubt that (1) the patient has a severe mental disorder; (2) the disorder 'is not in remission or cannot be kept in remission without treatment'; and (3) by reason of that disorder, the patient represents a substantial danger of physical harm to others." (*People v. Burroughs* (2005) 131 Cal.App.4th 1401, 1404.) "The term 'remission' means a finding that the overt signs and symptoms of the severe mental disorder are controlled either by psychotropic medication or psychosocial support." (§ 2962, subd. (a)(3).)

"In considering the sufficiency of the evidence to support MDO findings, an appellate court must determine whether, on the whole record, a rational trier of fact could have found that defendant is an MDO beyond a reasonable doubt, considering all the evidence in the light which is most favorable to the People, and drawing all inferences the trier could reasonably have made to support the finding. [Citation.] ' " 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the [finding] is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. . . .' [Citation.]" ' " (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082-1083.)

***Sufficient Evidence Supported the Commitment Order***

There was sufficient evidence that defendant's pedophilic disorder was not in remission. The evidence showed that the overt signs and symptoms of defendant's pedophilic disorder were not controlled through treatment. Defendant's testimony demonstrated that he was currently sexually attracted to prepubescent girls. When asked to describe the eight-year-old that he molested, defendant responded: "Eight-year-old, medium blond hair. Blond hair is my type. I like girls, blue-eyed blonds, green-eyed blonds, I know that." Defendant also testified that the four-year-old girl he molested was

7

"a pretty little blond" who "looked like a little doll." The foregoing testimony, considered together, showed that defendant was currently experiencing a sexual attraction toward blond-haired prepubescent girls. Dr. Cirimele's testimony established that defendant was unable to control that attraction through treatment. Dr. Cirimele testified that defendant's pedophilic disorder was not in remission, and he explained that defendant had not "received enough sex offender treatment [to] control his behavior." Dr. Cirimele further testified that defendant had made "no progress" in his sex offender treatment in the past year and was unable to "recognize any symptoms or red flags that could cause him to molest a child in the future." The evidence thus showed that the overt signs and symptoms of defendant's pedophilic disorder were not controlled through treatment, and there was sufficient evidence that defendant's pedophilic disorder was not in remission.

There was sufficient evidence that defendant currently represented a substantial danger of physical harm to others due to his pedophilic disorder. Dr. Cirimele opined that defendant posed a substantial danger of physical harm to others due to his pedophilic disorder, and he cited many facts that supported that opinion. Dr. Cirimele explained that defendant's score on the HCR-20 showed that defendant posed a danger of violence. Dr. Cirimele also explained that lack of insight is a significant factor in determining dangerousness, and he identified many circumstances that showed defendant's lack of insight into his pedophilic disorder. In particular, Dr. Cirimele described the following facts that demonstrated defendant's lack of insight: defendant denied suffering from pedophilic disorder; during the year before the MDO trial, defendant said that "he doesn't believe he needs sex offender treatment"; during the year before the MDO trial, defendant stated that "there was nothing sexual about the molestation of the four-year-old"; during the year before the MDO trial, defendant "said that if he was a different type of psychopath, he would have just taken [the four-year-old molestation victim] to the

8

cemetery and cut her heart out"; defendant did not understand the harm caused by his pedophilic behavior; defendant insisted that he was "help[ing] the country in being able to do a possible mission in Iran" when he molested the four-year-old girl; defendant currently believed that he did not have to follow the laws regarding the "age of consent"; and defendant currently believed that he was a victim of the legal system. Dr. Cirimele finally explained that defendant's belief that "he's the victim" was a "significant risk factor" demonstrating that defendant was unable to obey laws. The foregoing evidence sufficiently established that defendant currently represented a substantial danger of physical harm to others due to his pedophilic disorder.

Defendant contends that we must reverse the commitment order because there was insufficient evidence that he had "serious difficulty controlling his pedophilic behavior." In support of his argument, defendant cites *In re Anthony C.* (2006) 138 Cal.App.4th 1493 (*Anthony C.*). *Anthony C.* noted that substantive due process requires "that there be proof of serious difficulty in controlling dangerous behavior" in order to civilly commit a person. (*Id.* at pp. 1504-1505.) In *Anthony C.*, an expert witness testified that a minor posed a moderate risk to the community if released from civil commitment, and the Court of Appeal concluded that such testimony did "not constitute substantial evidence that [the minor] has serious difficulty controlling his behavior." (*Id.* at p. 1507.) Defendant's case is distinguishable from *Anthony C.* because the evidence established that defendant had serious difficulty controlling his behavior. Dr. Cirimele opined that defendant had "serious difficulty controlling his dangerous behavior." Extensive evidence supported Dr. Cirimele's opinion: defendant expressed his belief that he did not have to follow laws regarding the "age of consent"; defendant did not recognize any signs or symptoms that could cause him to molest a child in the future; defendant had made "no progress" in his sex offender treatment in the year preceding the MDO trial; historically, when defendant has thought of molesting a child, he acts on the intention; and defendant's

9

belief that "he's the victim" was a "significant risk factor" demonstrating that defendant was unable to obey laws. Thus, unlike *Anthony C.*, substantial evidence established that defendant had serious difficulty controlling his dangerous behavior. Defendant's reliance on *Anthony C.* is unavailing.

In sum, there was sufficient evidence to support the MDO commitment order. We therefore must affirm the order.

## DISPOSITION

The order extending defendant's commitment is affirmed.

10

_____
                                    RUSHING, P.J.




WE CONCUR:




_____
     ELIA, J.








_____
     WALSH, J.[*]






*People v. Simmons*
**H041329**

_____

[*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11