Filed 9/22/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br>v.<br>DORIAN GAYLORD REDUS,<br><br>     Defendant and Appellant. | A157368<br><br>(San Francisco County<br>Super. Ct. No. SCN88778) |

Dorian Gaylord Redus appeals from the trial court's order extending his civil commitment at Napa State Hospital, pursuant to Penal Code section 1026.5,[1] until December 3, 2019. He contends (1) substantial evidence does not support the court's finding that his mental illness causes him serious difficulty controlling potentially dangerous behavior, and double jeopardy principles preclude retrial or further commitment extensions, and (2) the commitment extension order must be reversed because the trial court failed to advise him of his right to a jury trial and to ensure that he knowingly, intelligently, and unconditionally waived that right.

Because appellant's most recent commitment extension has now expired, we find that this appeal is moot. However, because we find that appellant's substantial evidence claim is an issue that is likely to recur, but evade review—given the relatively short timeframe of each NGI commitment

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

extension—we will address that claim for the guidance of any future proceedings. We will then dismiss the appeal as moot.

## PROCEDURAL BACKGROUND

On July 10, 2017, the San Francisco County District Attorney filed a petition under section 1026.5 to extend appellant's civil commitment at Napa State Hospital for two additional years.

On March 19, 2019, after multiple continuances, appellant waived his right to a jury trial and the matter proceeded to a two-day court trial.

On May 20, 2019, the court found that the petition had been proven beyond a reasonable doubt and on May 21, 2019, the court ordered appellant's commitment extended for two years, until December 3, 2019.

On May 29, 2019, appellant filed a notice of appeal.

## FACTUAL BACKGROUND

Appellant was first committed to the Department of State Hospitals in 1975, after being found not guilty by reason of insanity (NGI) of murder in the stabbing death of his common law wife. Appellant was 73 years old at the time of his court trial in the present case, which took place on March 19 and 20, 2019. At his trial, the following evidence was presented.

### The District Attorney's Case

Dr. Mahlet Tekeste, a staff psychologist at Napa State Hospital, testified as an expert in the field of psychology and risk assessment vis-à-vis the HCR-20 violence risk assessment tool. Dr. Tekeste had been appellant's treating psychologist for approximately 10 months. She opined that appellant suffers from schizoaffective disorder, bipolar type, which is not in remission. The symptoms she had observed in appellant included psychosis, delusional thought content involving fixed false beliefs about various topics, and disorganized speech.

2

Dr. Tekeste opined that appellant continued to pose a substantial danger of physical harm to others based on his "continue[d] lack of insight about the committing offense and what contributed to it. He continues to lack insight about his mental illness and his continued need for treatment because [he] continues to have those symptoms that contributed to the committing offense and does not see those symptoms as symptoms but, rather, a persecutory engagement by practitioners and [staff of the conditional release program (CONREP)] and other people . . . ." The pervasive and systemic nature of appellant's belief that all clinicians and all CONREP workers had wronged him and were against him "suggest[ed] a delusional sort of thought content" as well as psychosis.

Dr. Tekeste did not believe appellant had an adequate understanding of what contributed to the commitment offense in that he said he felt he was in danger from the victim and believed she was going to harm him at the time he killed her. He also believed his psychiatrist at the time was advising him to stay with her, thereby putting him at further risk. He explained that he had postmortem vaginal and anal intercourse with the victim because "he was trying to prove a null hypothesis," to be sure that performing these acts was not going to bring her back to life. Appellant had expressed these beliefs to Dr. Tekeste some two months before trial.

Dr. Tekeste had reviewed the conclusions of the HCR-20 risk assessment of appellant, which were consistent with her own conclusions regarding appellant's "ongoing lack of insight, his ongoing symptoms, and his treatment or supervision response, meaning that his lack of insight and his continued delusions contribute to his violence risk . . . ." She also agreed with the assessment's conclusion that in the structured environment of the

3

hospital, appellant was a low risk for violence, but in the community, he would be a high risk for violence.

Dr. Tekeste testified that appellant's release to CONREP had been revoked on three or four occasions. In her opinion, appellant would continue to be a risk even on CONREP, considering his multiple past revocations and his lack of insight into those revocations, which he viewed "as a conspiracy against him," with people "wanting to keep him locked away rather than being able to reflect on those revocations and plan for something different." For example, appellant had been unable to accurately recount that he had been revoked for not taking his medications, which was problematic because that meant it was not possible to plan for his future medication compliance.

With respect to his psychiatric medications, appellant had said he did not believe he needed an increase in his medications and "indicat[ed] that he's not delusional, he doesn't need medication." If appellant were released, Dr. Tekeste would have concerns about his medication compliance both because he had a history of noncompliance and, "while he says that he would continue taking medications that are prescribed, he has caveats as to when or what . . . ." Dr. Tekeste believed that if he were medication noncompliant, appellant would have serious difficulty controlling his dangerous behavior. Moreover, even with the medications he was presently taking, he was not in remission and continued to suffer active symptoms of psychosis.

On cross-examination, Dr. Tekeste testified that appellant received monthly injections of his psychiatric medications and Dr. Tekeste was not aware of him ever rejecting the actual injection. But she was aware of times that he had declined medication changes or increases because he did not think they were necessary. For example, appellant had given her a letter regarding his psychiatrist's desire to increase his medication and the content

4

of the letter "seemed persecutory and paranoid in nature," rather than an accurate reflection of what Dr. Tekeste had observed. Still, appellant never expressed any aggressive or violent ideas about that psychiatrist, and when the doctors had decided he needed a medication increase, he acquiesced. Dr. Tekeste had not observed any marked change in appellant's behavior or symptoms since the medications were increased.

Dr. Tekeste had not witnessed appellant engaging in any aggressive or violent behaviors in the hospital. Nor had she found anything in her record review to suggest that he ever committed any acts of violence since the commitment offense, despite his fixed delusions.

Dr. Tekeste believed that appellant's delusions contributed to his risk of dangerousness because his belief that the people who were treating him were conspiring against him posed a risk to "his ability to utilize those resources as well as a risk [to] his ability to understand or have insight into people's concerns about him or his behavior." That lack of insight was consistent with the "same sort of paranoid, persecutory [symptoms] . . . related directly to his incident offense," and "the concern is if [those symptoms are] still here now, they may contribute to future violence."

Appellant was able to state his diagnosis and give his symptoms, but he seemed ambivalent about whether he agreed with the diagnosis. He also knew what medications he was receiving. In their most recent meeting, appellant had answered in the affirmative when Dr. Tekeste asked whether he believed he had a mental illness. He also said, however, that "people are misreporting what he has told them."

When discussing relapse prevention, appellant primarily talked about "how CONREP has wronged him and didn't do right by him. That's effectively the crux of his relapse prevention plan . . . ." Dr. Tekeste did not

5

believe that his relapse prevention plan was adequate because it was primarily focused on his grievances against CONREP rather than his actual mental illness, his symptoms, his triggers, or his potential for relapse. Appellant had told Dr. Tekeste that, if released, he planned to live with his daughter. He also said he planned to take his medications as prescribed after he left the hospital unless he had side effects.

Dr. Noelle Thomas, a staff psychiatrist at Napa State Hospital, testified as an expert in the area of psychiatric risk factors and dangerousness. Dr. Thomas had known appellant since 2016 and was currently his treating psychiatrist. She had met with him three or four times in the previous seven months. Dr. Thomas opined that appellant suffered from paranoid schizophrenia with a schizoaffective disorder. This diagnosis was based on his holding a worldview and understanding of his life based on "a very complex delusional system." Appellant had what he called a "cosmological vision," the foundation of which was that he "believe[d] that all of this, his being found guilty, not guilty by reason of insanity, considered psychotic, being given all these diagnoses, being in the hospital, is all at best just mistakes by clinicians and at worst a conspiracy of various clinicians against him."

Although appellant functioned well on a day-to-day basis in the very structured environment of the hospital and while on medication, Dr. Thomas believed "that his delusional system has expanded and continues to expand so that he—it's like he's living in two realities. . . . I wouldn't say the prognosis is fair because his insight is so poor." Appellant was "more and more absorbed in his own world" and had "less and less insight" into his mental illness and overall prognosis.

Dr. Thomas had received a letter from appellant dated February 2019, a month before trial. She found the letter to be very disorganized and not in sync with reality. The letter was of concern to Dr. Thomas both because it was "somewhat incoherent, but the other real concern is that it's very, very paranoid and blaming . . . ." Dr. Thomas read several passages from the letter to the court, including the sentence, "For the most recent 52 cosmological years your inappropriate punishments, therapy and falsification and reward system all show me that you do not know my right from wrong[.]" He also described those treating him as "nitwits" and believed his treatment "has amounted to rape." Dr. Thomas interpreted the letter to mean that appellant did not agree with the clinicians' diagnosis, risk assessments, or treatment of him. Instead, he had "his own interpretation of his condition, which is not a condition at all."

Dr. Thomas further testified that appellant's relapse prevention plan was "primarily criticisms of CONREP and other clinicians." She, like Dr. Tekeste, did not believe this was an effective relapse prevention plan. His position was essentially that "[s]ymptoms are what clinicians believe, not what he experiences, so, yes, of course, there could be no relapse prevention." The essence of relapse prevention involves accepting and having some understanding of the commitment offense and the factors that led to it, including triggers and symptoms, and without that understanding patients "remain as dangerous as they were."

Dr. Thomas opined that, due to his mental illness, appellant constituted a substantial danger of physical harm to others "[o]utside of the hospital." She believed that appellant's continuing paranoid symptoms involved "the distortion of reality and perception of danger and then what to do about it," and that "all three things make it quite dangerous." This

7

misperception of reality, together with his lack of insight and trust, led to his "nonacceptance of the need for medication or treatment," which also made him dangerous.

In Dr. Thomas's opinion, appellant did not really believe that he has a mental disorder and that, left to his own devices outside of the hospital, he probably would not take his medications. She also believed that outside of the structured environment of the hospital, appellant "could be very dangerous." She feared that he could decompensate if he did not have the structure of the hospital and was not forced to take his medication. In her opinion, appellant "could" have difficulty controlling his dangerous behavior because of his paranoia.

On cross-examination, Dr. Thomas described appellant as "quietly very angry at everything that's happened to him." He was nonetheless very high functioning in the structured environment of the hospital where he "has enough wherewithal to not step out of line." The previous year, appellant had been in a discharge unit, but he became very angry with his previous psychiatrist and began writing letters to her, and was therefore transferred back to a more structured unit.

Dr. Thomas acknowledged that appellant advocated for himself regarding his medications but did not refuse to take them. He also interacted appropriately with his peers in his unit and Dr. Thomas had never seen him act out in anger.

Regarding his commitment offense, appellant had indicated to Dr. Thomas that he committed the homicide in self-defense. She believed this was a delusion because appellant had told her he felt somewhat threatened in the relationship with the person he killed, that his psychiatrist told him to get a gun, and that he decided at some point to get a serrated

knife and stab her many times. He continued to believe he acted in self-defense even though the person he stabbed did not actually have a weapon in her hand.

### *Appellant's Case*

Appellant's daughter had remained in regular contact with appellant over most of the years of his hospital commitment and CONREP releases. She was retired from her 22-year career as a deputy sheriff, during which time she had worked regularly with mentally ill individuals.

Appellant's daughter and her two adult daughters lived in a two-unit building in San Francisco. Her daughters lived in one apartment and she lived in the other. She testified that appellant could come and stay in her apartment, where she had a spare room for him.

Appellant's daughter had never seen appellant act in an aggressive or violent manner. Nor had she ever heard him use any violent or threatening language. She had no concerns for her personal safety if appellant were to live with her. She understood the need for appellant to continue taking his medications and he had indicated to her that he would do so. If appellant lived with his daughter, she would ensure that he received his monthly medication injection and would supervise any medical appointments.

Dr. John Podboy, a clinical and forensic psychologist in private practice, testified as an expert in the field of psychology and risk assessment. Dr. Podboy first met appellant four or five years before trial, and had spent a total of 8 or 10 hours with him over the years. Their most recent meeting took place approximately three months before trial. Appellant had expressed his dissatisfaction with CONREP staff and had written about things that angered him, but never made any threatening remarks toward anybody.

9

Dr. Podboy opined that appellant suffered from schizophrenia, paranoid type. However, he did not observe any symptoms of paranoia in appellant during their most recent meeting. Appellant had stated that "he thinks a lot of the psychiatric diagnoses are sophistry but plausible," and admitted that he was mentally ill. Dr. Podboy believed that appellant's writings, in which "he goes on and on . . . about what's accurate and what's not," were "kind of goofy," but he also believed the writing was therapeutic. Some of the thoughts appellant expressed to Dr. Podboy and in his writings were paranoid and symptoms of his mental illness, but Dr. Podboy did not think anything in the writings rose to a level of paranoia that could not be controlled.

Dr. Podboy further believed that appellant needed his psychiatric medications to partially control his mental illness and that his symptoms were being controlled by the medications he was taking. He had expressed an understanding that it was critical to take his medications. Appellant, who received money each month as a disabled veteran, was also looking forward to being with his family.

Dr. Podboy opined that appellant, who had not exhibited any dangerous behavior in the time Dr. Podboy had known him, did not currently have serious difficulty controlling any dangerous behavior. Nor did Dr. Podboy have any concerns about appellant posing a substantial danger of physical harm to others. He believed that appellant's mental illness was controlled "in large measure" by his medications and by the fact that "he does not want to pass his final days in the mental hospital." Dr. Podboy had no concerns about appellant continuing to take his medications as prescribed, even in an unsupervised environment. He had discussed this issue with both appellant and his daughter. Dr. Podboy believed appellant was "an exemplary patient"

10

in the hospital, "other than the fact that he gets people upset sometimes with his writings."

On cross-examination, Dr. Podboy testified that he did not think it was wrong of hospital staff to transfer appellant from the discharge unit to a more structured unit because "[t]hey had a program to run, and he shouldn't be doing things like that," i.e., writing angry letters to his psychiatrist. Also, Dr. Podboy was familiar with appellant's four failures with CONREP over the years, including the last one that involved homicidal ideation. When asked whether that was concerning to him, Dr. Podboy responded, "Up to a point, yes." Dr. Podboy did not believe appellant's psychological functioning and delusional system could be changed at this point in his life and that it was "ethically irresponsible" to keep him hospitalized, when the doctors had nothing to offer him other than keeping him locked up and medicated.

When the court expressed concern about whether appellant's paranoia, which was targeted at psychiatrists or mental health workers, would make him more prone to some kind of direct physical action against the object of the paranoia, Dr. Podboy responded that, at appellant's age and with his physical status, he did not believe so, stating, "I mean, you could probably push him over with one finger."

Following the close of testimony, during a discussion with counsel, the court stated that it believed that appellant probably posed a substantial danger of physical harm to others, but that it had "a problem" "so far" with the proof that he had serious difficulty controlling his dangerous behavior. The court therefore stated it would request a copy of the trial transcript so that it could review the testimony on that question, and continued the matter until May 20, 2019.

11

At the May 20, 2019 hearing, following additional argument by counsel and a discussion of the trial testimony, the court concluded: "I think all the evidence put together, the testimony from Dr. [Tekeste], I believe it was, that talks about that [appellant is] not in remission, that he has ongoing lack of insight, his ongoing symptoms. If you look at the whole testimony of all the doctors that his lack of treatment [*sic*] plan, that he—I think that's a very crucial part for the doctors, tak[ing] the testimony as a whole—in fact, Dr. Thomas says his delusional system has expanded and continues to expand." The court noted that there was testimony that appellant's delusions were "similar to what led him to commit the initial offense. And the fact that there is serious doubt whether he would be med[ication] compliant. . . . Lack of insight is consistent with the same sort of persecutory things that related directly to the incident." The court further noted that appellant's letter to his prior psychiatrist was paranoid and delusional.

The court therefore concluded there was "enough in here to show that he—due to his delusions and paranoi[a], and the last quote I read about that it's similar to what happened back then, that he does pose a substantial danger and that outside of a controlled environment he could not—he would have serious difficulty controlling his dangerous behavior. [¶] So based on the evidence heard in this proceeding the court finds the People's extension petition true beyond a reasonable doubt." The court therefore issued an order extending appellant's commitment for two years, until December 3, 2019.

## DISCUSSION

### I. *Mootness*

Appellant's most recent commitment expired on December 3, 2019, while this appeal was pending. Both parties have informed this court that the district attorney filed another commitment extension petition on June 17,

12

2019, although a trial on that petition has not yet been held. We therefore must consider whether this appeal should be dismissed as moot.

"As a general rule, an appellate court only decides actual controversies. It is not the function of the appellate court to render opinions ' " ' "upon moot questions or abstract propositions, or . . . declare principles or rules of law which cannot affect the matter in issue in the case before it." ' " ' [Citation.] '[A] case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief. [Citation.]'. . . [Citation.]" (*People v. Rish* (2008) 163 Cal.App.4th 1370, 1380 (*Rish*).)

In this case, because the two-year commitment extension order from which appellant appeals has expired, the appeal is now moot. Appellant argues that we should nevertheless decide the appeal on the merits because he has raised a question as to whether double jeopardy applies to NGI civil commitment extensions, which could affect the trial court's continued jurisdiction in subsequent recommitment proceedings. In support of this argument, appellant cites several opinions in which courts of appeal found that claims of alleged error in mentally disordered offender (MDO) proceedings related to the *initial* commitment were not moot because they could affect the court's jurisdiction in subsequent proceedings. (*People v. J.S.* (2014) 229 Cal.App.4th 163, 170–171 [MDO defendant's appeal was not moot despite expiration of initial one-year commitment because "the initial determination of whether an offender qualified as an MDO continues to have practical effects"]; *People v. Fernandez* (1999) 70 Cal.App.4th 117, 134–135 [appeal was not moot because appellate court's "decision may still affect the lower court's right to continue jurisdiction under the original commitment as well as the recommitment"]; *People v. Williams* (1999) 77 Cal.App.4th 436, 441 & fn. 2 [appeal was not moot both because issue raised regarding alleged

13

procedural improprieties in initial MDO commitment proceedings implicated validity of subsequent commitment orders, and because issue was "important and of continuing interest"].)

The present case involves commitment extension proceedings, not the validity of an initial commitment, which was an important consideration in all of the cases cited by appellant. In addition, the double jeopardy issue raised by appellant is a complex one, which respondent did not address in its briefing and appellant addressed only in a very general way. Nor did either party discuss at oral argument the applicability of double jeopardy principles to civil commitments. For these reasons, we decline to exercise our discretion to decide appellant's appeal from the expired recommitment order on the merits. (See *Rish, supra,* 163 Cal.App.4th at p. 1380.)

However, before dismissing the appeal, we will consider appellant's contention that substantial evidence does not support the court's finding that his mental illness causes him serious difficulty controlling potentially dangerous behavior. We do so because that issue is likely to recur but evade review, considering the relatively brief civil commitment period for NGI's and the delays that often occur both during recommitment proceedings in the trial court and on subsequent appeal,[2] and also because we believe that it would be useful to examine that issue "for the guidance of future proceedings before dismissing the case as moot." (*People v. Cheek* (2001) 25 Cal.4th 894, 897–898 (*Cheek*); see *Rish, supra,* 163 Cal.App.4th at p. 1380.)[3]

---

[2] At oral argument, appellant's counsel indicated that no trial date has yet been set on the pending petition, filed over a year ago, because the court and the parties are still waiting to receive records from Napa State Hospital.

[3] For the benefit of the trial court and the district attorney, we also note that the jury waiver advisement given in this case is highly questionable. In the event of further proceedings in this matter, we trust that the court will

## II. *Sufficiency of the Evidence to Support the Commitment Extension*

### A.

Section 1026.5, subdivision (a)(1) provides that an NGI defendant committed to a state hospital after being found not guilty of an offense by reason of insanity pursuant to section 1026 "may not be kept in actual custody longer than the maximum term of commitment." (§ 1026.5, subd. (a)(1).) However, under section 1026.5, subdivision (b)(1), an NGI defendant may be committed beyond the term prescribed by subdivision (a) if he or she "has been committed under Section 1026 for a felony and," after a trial, the trier of fact finds that he or she "by reason of mental disease, defect, or disorder represents a substantial danger of physical harm to others." (§ 1026.5, subd. (b)(1), (3); see *People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1159 (*Zapisek*).) Proof of dangerousness also requires proof that the NGI defendant has "at the very least, serious difficulty controlling his potentially dangerous behavior." (*Zapisek*, at p. 1165; see also *People v. Kendrid* (2012) 205 Cal.App.4th 1360, 1370 ["The requirement of serious difficulty in controlling dangerous behavior 'serves "to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control" ' "].) This requisite inability to control behavior " 'will not be demonstrable with mathematical precision [and it] is enough to say that there must be proof of serious difficulty in controlling behavior.' " (*Zapisek*, at p. 1161.)

Pursuant to section 1026.5, the NGI defendant is entitled to a jury trial and representation by counsel, to discovery under criminal rules, to appointment of psychologists or psychiatrists, and to "the rights guaranteed

---

ensure appellant is fully advised of his jury trial right and understands exactly what he will be giving up if he waives that right.

15

under the federal and State Constitutions for criminal proceedings," including the right to a jury trial. (§ 1026.5, subd. (b)(2)-(7).) If the trier of fact finds that the NGI defendant does represent a substantial danger of physical harm to others, he or she may be recommitted "for an additional period of two years from the date of termination of the previous commitment[.]" (§ 1026.5, subd. (b)(8).) Further extensions can be sought at two-year intervals thereafter.

" ' " 'Whether a defendant "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others" under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony.' [Citation.] 'In reviewing the sufficiency of evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt. [Citations.]' [Citation.]" [Citation.] A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5. [Citations.]' [Citation.]" (*Zapisek*, *supra*, 147 Cal.App.4th at p. 1165.) However, "expert medical opinion evidence that is based upon a ' "guess, surmise or conjecture, rather than relevant, probative facts, cannot constitute substantial evidence." ' [Citations.]" (*In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1504 (*Anthony C.*).)

In the present case, appellant does not dispute his diagnosis of a mental disorder or challenge the trial court's finding that he represents a substantial danger of physical harm to others. (See § 1026.5, subd. (b)(1), (3).) His sole contention is that the evidence does not support the court's

16

finding that he has serious difficulty controlling his potentially dangerous behavior. (See *Zapisek*, *supra*, 147 Cal.App.4th at p. 1165.)

At the time of the commitment extension trial, appellant, then 73 years old, had not committed a violent act since his commitment offense some 45 years earlier. Dr. Podboy, who described appellant as a "fragile old man," did not believe he was physically capable of taking action against an object of his paranoia even if he wanted to, given his age and his physical status, noting that he had "gone downhill physically" and that "you could probably push him over with one finger." Even the court itself initially indicated that it had "a problem" with the proof that appellant had serious difficulty controlling his dangerous behavior.

Both Dr. Tekeste and Dr. Thomas acknowledged that appellant was very high functioning and interacted appropriately with his peers within the hospital setting. They were concerned, however, that without the structure of the hospital and if he stopped taking his medications, he would decompensate and would—or, in the words of Dr. Thomas, "could"—have difficulty controlling his dangerous behavior. In reaching this conclusion, they focused on appellant's fixed delusions, which have continued through the decades and have manifested in part as a belief that CONREP staff and other treatment providers have mistreated him; his lack of engagement in treatment; and his lack of insight into his commitment offense and his illness generally.

It is true that an NGI defendant's lack of insight and continued delusions of the kind he or she suffered from at the time of the commitment offense can support a finding of continued dangerousness. (See, e.g., *People v. Sudar* (2007) 158 Cal.App.4th 655, 663–664 [NGI defendant suffered from same delusion that was in effect when he committed arson offense that led to

17

his institutionalization, "and consistently maintained that he would do the same thing in the same circumstances"]; *Zapizek*, *supra*, 147 Cal.App.4th at p. 1166 [strongest proof of dangerousness was evidence that NGI defendant's delusions were of the same type as those he experienced at time of commitment offense, where experts had provided specific testimony that he repeatedly acted on his delusions and paranoia in inappropriate ways while in confinement "so as to pose a danger to others"].) In this case, however, the experts were unable to point to any evidence of appellant committing a single violent act during all of those years in the hospital. On the contrary, there had not been a hint of violence, threatening behavior, or aggressiveness of any kind on the part of appellant over multiple decades, even through CONREP releases and medication lapses. Rather, the evidence showed that appellant has controlled his dangerous behavior for decades, despite his ongoing delusions and paranoia.

With respect to appellant's CONREP history, the testimony and medical reports admitted at trial showed that appellant was first released to CONREP in 1988, and that his outpatient status was subsequently revoked three times "for issues related to treatment and medication compliance." He was then released again, before his final revocation in 2009, which occurred after he belatedly reported homicidal ideation. There was no evidence that he acted out violently during any of those CONREP releases. Indeed, when he experienced homicidal thoughts, he did not act on them; he reported them to CONREP staff. (See *Anthony C.*, *supra*, 138 Cal.App.4th at p. 1508 [reversing commitment extension order after finding that no rational trier of fact could have found beyond a reasonable doubt that juvenile defendant had serious difficulty controlling his sexually deviant behavior, based in part on

evidence that he did not act on his sexual fantasies in an inappropriate manner during his confinement].)

In addition, while the court stated that a letter appellant wrote to his prior psychiatrist was angry, it also specifically found that the letter was not threatening. Indeed, appellant's thousands of pages of writing, some of which included his beliefs about how he had been wronged, never included threats against anyone. Thus, while reflecting his delusional belief system, appellant's writing was, as Dr. Podboy put it, "therapeutic," and, if anything, assisted him in controlling himself and *not* endangering others. According to Dr. Thomas, even though appellant expressed anger in his writings, she had never seen him act out in anger. Dr. Tekeste made clear that, despite appellant's letter containing persecutory and paranoid beliefs about his psychiatrist's desire to increase his medication, he had never expressed any aggressive or violent ideas about that psychiatrist and, when it was decided that he did need a medication increase, he acquiesced.

We conclude the evidence presented at trial simply does not provide the required link between appellant's ongoing mental illness and his purported difficulty in controlling his potentially dangerous behavior. (See *Zapisek*, *supra*, 147 Cal.App.4th at pp. 1165, 1166; *Anthony C.*, *supra*, 138 Cal.App.4th at p. 1504 [expert medical opinion based on a " ' "guess, surmise or conjecture" ' " cannot constitute substantial evidence].) Instead, what becomes clear from the evidence is that appellant is an elderly man who, after almost half a century of hospitalization, continues to exhibit symptoms of his mental illness, including delusions and paranoia, and whose delusions and lack of insight into his illness are unlikely to improve very much,

19

regardless of whether he remains hospitalized.[4]  The evidence also shows, however, that despite all of this, he has not committed a single violent or aggressive act, or even spoken in a violent or threatening way, for some 45 years.

Having reviewed the entire record in the light most favorable to the extension order, we thus conclude substantial evidence simply does not support the court's finding that appellant's mental illness causes, "at the very least, serious difficulty controlling his potentially dangerous behaviors." (*Zapisek*, *supra*, 147 Cal.App.4th at p. 1165; see also *People v. Kendrid, supra,* 205 Cal.App.4th at p. 1370 [proof is required that an NGI defendant currently "suffer[s] from a volitional impairment rendering [him] dangerous beyond his control."].)

**B.**

Although this appeal is moot, that does not mean our finding of insufficient evidence is completely irrelevant to any further proceedings in this matter.  (See *Cheek*, *supra*, 25 Cal.4th at pp. 897–898.)

*Turner v. Superior Court* (2003) 105 Cal.App.4th 1046 (*Turner*) is particularly instructive in this regard.  In that case, Division One of the Fourth District Court of Appeal addressed the claim of a defendant who had

---

[4] Dr. Podboy did not believe that appellant's psychological functioning could be changed at this point in his life and that, other than keeping him locked up and medicated, the hospital had nothing to offer him.  Dr. Podboy also believed appellant would be motivated to continue taking his medications because he did not want to spend his last days in the hospital, and that appellant's medication, as well as "his environment, which would be very benign with his family," would help control his paranoia.  The doctor's opinion was bolstered by evidence that, upon his release, appellant's daughter, a retired deputy sheriff, testified that she was prepared to offer him a home with her and to supervise his monthly medication injections and other medical appointments.

been civilly committed as a sexually violent predator (SVP). Two years later, during a commitment extension proceeding, a jury found that he was not likely to commit sexually violent predatory acts and he was released on parole. A short time later, he was taken into custody, his parole was revoked, and he was returned to prison. A new petition was then filed seeking to again commit the defendant as an SVP. The defendant moved to dismiss the petition on the ground that the prior jury finding that he was not an SVP was binding in the new proceeding, but the trial court denied the motion. (*Id.* at pp. 1051–1053.)

On appeal, the appellate court "conclude[d] that although the prior jury determination does not necessarily bar a subsequent SVP [Act] petition after a new custodial term, in the subsequent proceeding the People may not relitigate the finding that the individual was not an SVP at the time of the prior release. Therefore, to establish probable cause on the subsequent petition, the district attorney must present evidence of changed circumstances affecting this factual determination." (*Turner*, *supra*, 105 Cal.App.4th at p. 1050; accord, *People v. Munoz* (2005) 129 Cal.App.4th 421, 431–432.) If this were not the rule, "the integrity of the first proceeding could be undermined and there would be serious questions about the fundamental fairness of a scheme that would permit the government to file successive petitions against an individual in the same forum and on the same facts in a proceeding that could potentially result in a complete loss of liberty for that individual." (*Id.* at p. 1057; accord, *Munoz,* at pp. 431–432.) "In requiring the district attorney to present evidence of changed circumstances," the *Turner* court was "not suggesting that historical information is no longer relevant. It clearly is. A mental health professional cannot be expected to render opinions as to current status without fully evaluating background

21

information.  However, where an individual has been found not to be an SVP and a petition is properly filed after that finding, the professional cannot rely solely on historical information.  The professional must explain what has occurred in the interim to justify the conclusion the individual currently qualifies as an SVP." (*Turner*, at p. 1060.)

*Turner* is of course neither factually identical nor procedurally applicable to the present case, given our mootness finding.  Still, we believe that the *Turner* court's analysis, and ours, will nonetheless be relevant as guidance in any future proceedings related to appellant's potential recommitment under section 1026.5.  (See *Cheek*, *supra*, 25 Cal.4th at pp. 897–898.)

## DISPOSITION

The appeal is dismissed as moot.

                                 _____

                                 Kline, P.J.

We concur:

_____

Stewart, J.

_____

Miller, J.

*People v. Redus* (A157368)

Trial Court:                San Francisco County Superior Court

Trial Judge:                Hon. Ksenia Tsenin


Attorney for Appellant:     By Appointment of the Court of Appeal
                            First District Appellate Project
                            Julia Freis

Attorneys for Respondent:   Attorney General of California
                            Xavier Becerra

                            Lance E. Winters
                            Chief Assistant Attorney General

                            Jeffrey M. Laurence
                            Senior Assistant Attorney General

                            Bruce L. Ortega
                            Deputy Attorney General

                            Rene A. Chacon
                            Supervising Deputy Attorney General