Filed 10/8/25  P. v. Stone CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JORDAN MATTHEW STONE,<br><br>Defendant and Appellant. | F088455<br><br>(Super. Ct. No. FP004957A)<br><br><br>**OPINION** |

-ooOoo-

### THE COURT*

APPEAL from a judgment of the Superior Court of Kern County.  Stephanie Renee Childers, Judge.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberly A. Donohue, Assistant Attorney General, Ivan P. Marrs and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Franson, Acting P. J., Peña, J. and Fain, J.[†]

[†]Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

On March 25, 2024, the district attorney filed a petition seeking to recommit appellant Jordan Matthew Stone as an offender with a mental health disorder (OMHD) pursuant to Penal Code section 2970.[1]  Following a jury trial, the jury returned a verdict finding Stone qualified as an OMHD[2] on August 6, 2024.  On appeal, Stone contends substantial evidence does not support the jury's determination.  We affirm the trial court's orders.

## FACTS AND HISTORY OF THE PROCEEDINGS

*Legal Background*

The Mentally Disordered Offenders Act (§ 2960 et seq.) "provides for involuntary civil commitment as a condition of parole for prisoners who are found to have 'a severe mental disorder' if certain conditions are met.  (§ 2962, subds. (a)–(f).)  The commitment is for a term of one year and may be extended annually for an additional year on petition of the district attorney.  (§ 2972, subds. (a), (b), [(e)].)"  (*People v. Dunley* (2016) 247 Cal.App.4th 1438, 1442, fn. omitted.)

If the trial court finds "[1] that the patient has a severe mental health disorder, [2] that the patient's severe mental health disorder is not in remission or cannot be kept in remission without treatment, and [3] that by reason of the patient's severe mental health disorder, the patient represents a substantial danger of physical harm to others, the court shall order the patient recommitted."  (§ 2972, subd. (c).)

However, if the committing court finds there is reasonable cause to believe the committed person can be safely and effectively treated on an outpatient basis, the court shall release the person on outpatient status.  (§ 2972, subd. (d).)

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

[2]     OMHD prisoners were previously referred to as mentally disordered offenders or MDO's, but the Legislature changed the terminology in 2019.  (*People v. McCray* (2023) 98 Cal.App.5th 260, 264, fn. 1.)

For purposes of this statute, the term " 'severe mental health disorder' " means "an illness, disease, or condition that substantially impairs the person's thought, perception of reality, emotional process, or judgment; or that grossly impairs behavior; or that demonstrates evidence of an acute brain syndrome for which prompt remission, in the absence of treatment, is unlikely." (§ 2962, subd. (a)(2).)

The term " 'remission' " means "a finding that the overt signs and symptoms of the severe mental health disorder are controlled either by psychotropic medication or psychosocial support. A person 'cannot be kept in remission without treatment' if during the year prior to the question being before ... a trial court, the person ... [among other possible actions] has not voluntarily followed the treatment plan. In determining if a person has voluntarily followed the treatment plan, the standard is whether the person has acted as a reasonable person would in following the treatment plan." (§ 2962, subd. (a)(3).)

## Evidence at Trial

The parties stipulated Stone suffered three felony convictions and was committed to Atascadero State Hospital following a conviction for arson of a structure or forestland on December 13, 2021. (§ 451, subd. (c).) He was previously convicted of arson of a structure or forestland (§ 452, subd. (c)) on May 31, 2013, and first degree burglary (§ 459) on July 20, 2011.

Dr. Alexis Smith, a forensic psychologist at Atascadero State Hospital, testified that, in order to make a mental health disorder evaluation, she reviewed all of Stone's available records and legal records, treatment plans, social worker monthly notes, psychiatric progress notes, and forensic reports completed by other doctors. Smith consulted with members of Stone's treatment team and conducted interviews with Stone. As a result, Smith opined that Stone has a severe mental disorder, namely, schizoaffective disorder bipolar type.

Dr. Smith interviewed Stone twice, once on January 23, 2024, and again on July 18, 2024. She created a report after the first interview and updated the report after the second interview. During the first interview, Stone told Smith his 2021 arson conviction was based on false charges, and he was offended by the conviction. Stone suffered from delusions, including the belief that his wife was Queen Elizabeth as well as Angelina Jolie, and that his wife could be his parole officer because she was an agent. Stone denied he had a mental health disorder, but believed he was a military police officer, a Navy Seal, he attended West Point, he was a psychiatrist, an obstetrician and a secret service agent.

Dr. Smith explained that attendance at group therapy, while not mandatory, is heavily encouraged at the hospital and that around 75 to 80 percent of patients attend. Stone was supposed to attend groups targeting mental wellness and aggression reduction, as well as substance abuse classes, all standard groups at the hospital, but, as of July 18, 2024, Smith attended on average about 25 percent of his treatment group meetings. Smith looked at Stone's noncompliance with his treatment plan as a factor indicating whether or not he was trying to obtain release.

*1. Stone has a severe mental health disorder.*

After analyzing Stone's records, which showed his history of active psychiatric symptoms, Dr. Smith's interviews with Stone, his own self report of symptoms, and consultation with Smith's treatment team, Smith concluded, as to the first factor of the analysis (§ 2972, subd. (c)), that Stone suffered from a severe mental disorder — schizoaffective disorder bipolar type. Smith explained that Stone suffered from schizophrenia — the inability to ascertain reality as it is — and that he experienced both manic and depressive episodes in conjunction with the psychotic disorder. Smith testified that Stone's bipolar disorder creates an inability for him to control his emotions.

4.

## 2. *Stone's severe mental health disorder is not in remission or cannot be kept in remission without treatment*

As to the second factor of the analysis, whether Stone's mental health disorder was in remission or cannot stay in remission without being in a controlled environment (§ 2972, subd. (c)), Dr. Smith looked at Stone's medical records and interview with Stone for signs of active symptoms or absence of active symptoms, as well as Stone's behavior and treatment adherence. Smith opined that the records described ongoing delusional beliefs, typically grandiose in nature, as well as negative symptoms such as difficulty attending to hygiene, disheveled appearance, and lack of emotional expression. Smith acted on his delusional beliefs by writing letters to Buckingham Palace and by responding to internal stimuli manifested by talking or laughing to himself.

Dr. Smith testified that she did consider that Stone was under an involuntary medication order — he was required to take Clozapine, a heavy-duty psychiatric medication for patients with treatment resistant schizoaffective disorder and schizophrenia. Patients are generally encouraged to take their medication voluntarily, but if a patient refuses medication and presents a danger to themselves or others, the court can order involuntary medications.

Dr. Smith considered that schizoaffective disorder bipolar type typically requires lifelong treatment. She also considered whether Stone did or did not realize he has a mental disorder because, if a person has that insight, they recognize when symptoms are increasing and would increase their chance of getting help from a provider. Smith noted again that Stone attended, on average, only about 25 percent of his treatment group meetings.

Based on this evidence, Dr. Smith opined that Stone's schizophrenic disorder bipolar type was not in remission.

*3. By reason of the Stone's severe mental health disorder, Stone represents a substantial danger of physical harm to others*

Finally, as to whether by reason of his severe mental health disorder, Stone represents a substantial danger of physical harm to others (§ 2972, subd. (c)), Dr. Smith completed a violence risk assessment for Stone. As part of this assessment, Smith took into consideration that Stone has a severe mental health disorder with a history of violence, whether there was remission, whether there was a history of substance abuse, whether Stone had insight into his mental disorder, his lack of treatment compliance, and his discharge plan.

While the HCR-20 is a widely recognized assessment tool used by psychologists or other clinicians to assess a person's risk of violence, Dr. Smith did not use it in Stone's case because the tool includes factors that are statutorily excluded from consideration of the issue. The tool is not specific to the question of violence risk associated with a person's severe mental health disorder, and it does not address an individual's risk of harm to others. Smith explained that the Department of State Hospitals has determined that the HCR-20 is inadequate for patients with Stone's commitment, and there is no assessment tool recommended for the population which includes Stone. Smith used some of the factors included in the HCR-20 because those have been shown in research to increase an individual's risk of violence, including a person's history of violence related to severe mental health disorder, remission status, treatment compliance, insight, criminal history or general risk of violence, substance abuse history, and discharge plans. Smith's assessment is the standard way forensic determinations are completed.

Dr. Smith assessed each of the factors. As to violence, Stone threw or attempted to throw a bag of trash at a staff member in July of 2022. A week later, Stone threatened a peer, saying, "What are you going to do about it, you fucking … [(racial epithet)]. … I'll fuck you up. I'll rape you." Smith opined that these two incidents of violence demonstrated that Stone was experiencing active symptoms of his severe mental disorder,

6.

which presented in a physical and verbal way. Even though Stone had no other reports of physical violence, Smith remained concerned about his risk of danger of physical harm to others. Smith opined that Stone had not had any violent outbursts since because he is being involuntarily medicated and is in a 24-hour structured care environment.

Dr. Smith next considered that Stone has very poor insight into his mental disorder, as he has never admitted to Smith that he has a disorder, he showed a lack of compliance with treatment, and he avoids therapy groups because, according to Stone, other patients in those groups are mentally ill and he is not.

Dr. Smith testified that, if a person is medicated and then stops taking medication, it would almost certainly lead to psychiatric decompensation during which symptoms would become significantly worse, increasing their risk of physical harm to others. Stone told Smith he would be " 'fine' " if he stopped medication, and during his interview, told Smith he did not think anything would happen or anything would change if he stopped taking medication.

Dr. Smith considered Stone's past history of criminal convictions, which involved violent offenses with increased risk of physical harm to others: arson of a structure or forestland and first degree burglary.

Dr. Smith also considered that Stone has a history of substance abuse, including marijuana, heroin, methamphetamine, and alcohol. Dr. Smith opined that it was important for Stone to have an insight into his substance abuse because it would likely exacerbate or worsen psychiatric symptoms and increase the risk of physical harm to others. One of the therapy groups Stone is supposed to attend is the substance abuse program, but Stone has not completed the program. While Stone's substance abuse was currently in remission, it was likely due to being in a controlled setting.

In his first interview, Stone told Dr. Smith his discharge plans were to find a clean and sober environment with his wife, the Queen of England, who was also his parole officer. Stone stated he would stay on medication, if asked to do so. In his second

7.

interview, Stone told Smith his plans were to find a group home, attend church, and work at a grocery store. But he also expressed beliefs about being a military officer, a Navy Seal, and a Marine, and associated his discharge plans with being able to reengage in those professions. Smith opined that Stone's discharge plans increased the risk of physical harm to others.

Stone had not completed a relapse prevention plan, which is used to prevent both psychiatric decompensation and subsequent risk of aggression. The initial step of such a plan is to have the patient write out what their mental illness and substance abuse is. Because Stone did not believe he has either, he had not been able to move forward on a relapse prevention plan.

Dr. Smith opined that Stone represents a substantial risk of physical harm to others, specifically as to his mental illness. Many of Stone's prior acts of dangerous behavior and threat of harm to others occurred when he was actively symptomatic, which elevated his risk of harm to others.

Dr. Smith testified that factors which indicate that a patient is not a danger of physical harm to others include a patient's understanding of their mental illness and risk of violence if their symptoms are not controlled, engaging in treatment and recognizing the importance of ongoing medication, taking medication voluntarily, completing substance abuse programs, having rational and reasonable discharge plans, having a stable housing situation, understanding how to support one's self financially, and having an overall understanding of their risk of harm to others if they were to psychiatrically decompensate. Overall, Smith wants patients to have an understanding that they have a disorder and to take proactive steps to treat that disorder — none of those factors were present in Stone.

## DISCUSSION

Stone concedes that the first two elements under section 2972 have been proved — he has schizoaffective disorder bipolar type, a severe mental disorder, and the disorder

8.

is not in remission.  But he argues that substantial evidence does not support the jury's finding that he represents a substantial danger of physical harm to others because of his mental disorder.

"When reviewing a challenge to a civil commitment based on insufficient evidence, we consider the entire record in the light most favorable to the judgment to determine whether a reasonable trier of fact could have found beyond a reasonable doubt that the defendant met the requirements for the commitment.  (*In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1503.)  While inferences may constitute substantial evidence in support of a judgment, they must be the probable outcome of logic applied to direct evidence; mere speculative possibilities or conjecture are infirm.  (*People v. Herrera* (2006) 136 Cal.App.4th 1191, 1205.) … '[I]n determining whether the record is sufficient ... the appellate court can give credit only to "substantial" evidence, i.e., evidence that reasonably inspires confidence and is "of solid value." ' " (*People v. Jenkins* (2023) 95 Cal.App.5th 142, 150-151 (*Jenkins*).)

Section 2962 does not define a substantial danger of physical harm except by specifying that this element "does not require proof of a recent overt act."  (§ 2962, subd. (g); *People v. Johnson* (2020) 55 Cal.App.5th 96, 106 (*Johnson*).)  The California Supreme Court has instructed that, while " 'substantial danger of physical harm to others' is without definition[,] [i]n context, it appears to mean a prediction of future dangerousness by mental health professionals."  (*In re Qawi* (2004) 32 Cal.4th 1, 24.) " 'A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment' " (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165), so long as it is not based on a " ' "guess, surmise or conjecture, rather than relevant, probative facts." ' " (*In re Anthony C., supra,* 138 Cal.App.4th at p. 1504.)

Dr. Smith opined that, because of Stone's severe mental disorder, he represents a substantial danger of physical harm to others.  Stone's schizoaffective disorder bipolar

type is a chronic condition that is not in remission. Stone had a history of violence, having sustained two convictions for arson of a structure or forestland, and one conviction for first degree burglary. When Stone was first committed, he was not medicated and shortly thereafter threw or attempted to throw a bag of trash at a staff member, and then threatened a peer with a racial epithet and physical violence. Smith opined that Stone had not had any violent outbursts since because he is under a court order to be involuntarily medicated and is in an around the clock treatment environment.

Stone also has a history of substance abuse but has failed to complete any type of substance abuse program. Dr. Smith testified that Stone has no insight into his mental disorder or need for a treatment plan, as he has never acknowledged that he suffered from a severe mental health disorder. Stone does not regularly attend therapy groups and has avoided therapy groups because the patients in those groups are mentally ill, and he believes he is not. Stone told Smith that he did not think anything would happen if he stopped taking his medication. Smith testified the opposite would happen — and would almost certainly cause an eventual psychiatric decompensation leading to a worsening of symptoms, increasing the risk of physical harm. Smith opined that Stone's lack of insight into his substance abuse would also likely exacerbate or worsen psychiatric symptoms and physical harm to others if he was not in a controlled setting.

Dr. Smith testified that Stone's discharge plans, based on delusional beliefs of being married to the Queen of England who was his parole officer and of being an officer in the military, increased the risk of physical harm to others. And Stone had not completed a relapse prevention plan, which is used to prevent both psychiatric decompensation and subsequent risk of aggression.

Based on this record, there is sufficient evidence to support the jury's determination that Stone represents a substantial danger of physical harm to others due to his mental disorder.

Stone disputes the jury's conclusion, arguing that, "in his entire life [he] committed one act which represented a substantial danger or physical harm to others and may never have inflicted violence directly on anyone. Neither of his other two offenses represented a substantial danger to anyone. None of his behavior at the hospital represented such a danger." Stone cites to appellate opinions where the Court of Appeal determined insufficient evidence supported a trial court's ruling that the defendant continued to qualify as an OMHD. (See *Johnson, supra,* 55 Cal.App.5th 96; *Jenkins, supra,* 95 Cal.App.5th 142.) We find neither case helps Stone.

In *Johnson*, the appellate court reversed a commitment extension order where the record was devoid of evidence suggesting the 69-year-old defendant's failure to take medication in an unsupervised setting would lead to violence, particularly in light of the fact that he had spent 11 years in the community and had stopped taking his medication for substantial periods of time with no violent repercussions. (*Johnson, supra,* 55 Cal.App.5th at pp. 99, 107, 108-109.) Moreover, the defendant in *Johnson* was in partial remission, was able to take care of himself, and had not committed a violent act in 30 years. (*Id.* at pp. 101, 104, 111.) The *Johnson* court found, "Such a complete absence of violent or aggressive behavior of any kind over a long period of time is necessarily an important, objective factor that must not be ignored when determining an [OMHD] defendant's dangerousness." (*Id.* at p. 110.)

Stone also likens his case to *Jenkins* to argue the recommitment order should be reversed. The offender in *Jenkins* attacked her elderly landlord with a hammer in 1999 and was sentenced to 17 years in prison. (*People v. Jenkins, supra,* 95 Cal.App.5th at pp. 145–146.) The offender was committed as an MDO in 2014, and her commitment was extended multiple times although she had not been violent for more than 20 years. (*Id.* at p. 146.) In reversing the 2022 recommitment order, the *Jenkins* court found there was no substantial evidence the offender represented a substantial danger of physical harm to others because there was no evidence she had been violent or physically aggressive since

11.

her 1999 commitment offense, she was 70 years old, her mental health had improved, and her physical health had deteriorated. (*Id.* at pp. 151-153.) *Jenkins* found " '[s]uch a complete absence of violent or aggressive behavior of any kind over a long period of time is necessarily an important, objective factor that must not be ignored when determining [an MDO's] dangerousness.' " (*Id.* at p. 152.)

Here, in contrast, the evidence demonstrated Stone engaged in a violent or aggressive act within two years of his recommitment hearing, he had not successfully lived outside the structured setting of a state hospital, he was not taking his medications voluntarily, and nothing indicated that he was in poor physical health.

We lastly address Stone's argument that Dr. Smith "explicitly relied on her deliberate misuse of the HCR-20." He further argues that "[t]here was no reason Smith could not have used the HCR-20 with … caveats," and that using the HCR-20 "would have been more reliable than [Smith's] misuse of the instrument." Stone makes this argument, citing Justice Buchanan's concurring opinion in *Jenkins*, in which the justice is troubled by the fact that the experts failed to use any standard violence risk assessment tools in formulating their opinions about Jenkins. (*Jenkins, supra,* 95 Cal.App.5th at p. 156 (conc. opn. of Buchanan J.).) Justice Buchanan's concurrence in *Jenkins*, however, reflects his personal views, not binding precedent.

With that in mind, we cannot agree with Stone's analysis of the record as to Dr. Smith's testimony. Smith did not testify that she purposely misused the HCR-20. Instead, Smith testified that she utilized some of the well researched factors in assessing Stone's risk of violence, but did not use the HCR-20, per se, because the Department of State Hospitals determined that the HCR-20 is inadequate for patients with Stone's commitment. As Smith explained, there is no structural or actuarial tool that is recommended for patients in Stone's circumstances.

We conclude substantial evidence supports the jury's finding beyond a reasonable doubt that Stone represents a substantial danger of physical harm to others and thus continues to qualify him as an OMHD.

## DISPOSITION

The order recommitting Stone is affirmed.